**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: I.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1178 EDA 2025 |

Appeal from the Order Entered April 30, 2025
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0000389-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: I.S.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1179 EDA 2025 |

Appeal from the Decree Entered April 30, 2025
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000064-2025

BEFORE:  BOWES, J., NICHOLS, J., and BECK, J.

MEMORANDUM BY BOWES, J.:  **FILED NOVEMBER 12, 2025**

A.B. ("Father") appeals from the April 30, 2025 decree involuntarily terminating his parental rights as to I.B., born in August 2022.[1]  He also appeals the April 30, 2025 order that changed I.B.'s permanency goal from

_____

[1] On the same day, the family court additionally terminated the parental rights of I.B.'s mother, J.W. ("Mother").  Mother did not appeal that determination.

reunification to adoption.  We affirm the underlying termination decree and goal change order.

The Philadelphia Department of Human Services ("DHS") first became involved with I.B. shortly after her birth.[2]  Specifically, DHS learned that she was brought from the birth hospital to a home in which Mother had previously resided that was deemed unsuitable by the agency due to mold, inoperable appliances and plumbing, and lack of utilities.  DHS implemented a safety plan wherein Mother agreed that she and I.B. would reside with a family member.  Father, who was on parole, had minimal contact with DHS around this time.

The agency learned that Father became incarcerated in April 2023 based on allegations of a physical assault against Mother.  The incident occurred at a residence with poor living conditions in which Mother was not approved to reside with I.B.  The family court adjudicated I.B. dependent in June 2023 and committed her to the care of DHS, who in turn placed I.B. with a pre-adoptive resource parent.  Father was tasked with the following single case plan objectives:  sign all releases of information for I.B.; provide the agency with

_____

[2] DHS had interactions with respect to Mother, Father, and several of I.B.'s older siblings as far back as 2015, based on allegations that the children were subject to inadequate food and shelter conditions and that Mother was consuming controlled substances in their presence.  The family court terminated the parental rights of both Mother and Father as to those siblings in September 2024, and this Court affirmed those decrees in two memoranda filed on April 15, 2025.  *See Interest of A.B.*, 339 A.3d 406, 2025 WL 1114164 (Pa.Super. 2025) (non-precedential decision); *Interest of A.B.*, 339 A.3d 407, 2025 WL 1114468 (Pa.Super. 2025) (non-precedential decision).

housing information in the event of release from prison; assure that I.B.'s medical, dental, and vision needs are satisfied; ensure that educational needs are met; and take steps to confirm that I.B. is supervised at all times. At some point, Father was released from jail after the assault charges were withdrawn. During the period that Father was known not to be incarcerated, DHS attempted to maintain contact with him via telephone with little success. He did not reach out to DHS to discuss his objectives or inquire at all about I.B., nor did he have any visits with the child, even though DHS declared that it would have assisted in coordinating the same.

The certified record indicates that in October 2024, Father was again arrested, this time for robbery charges. Upon discovering this, DHS transitioned its method of communication with Father to sending him mail. Notably, no correspondence addressed to Father at the jail was ever returned as undeliverable. Furthermore, representatives of the agency also tried on two separate occasions to visit Father in person while he was incarcerated, but were unsuccessful in doing so in one instance because the jail went into lockdown and prohibited visits that day. It was unclear why the second attempt failed. Nonetheless, Father did not respond to DHS or otherwise take any steps to be involved in I.B.'s life while in prison. He likewise neglected to sign any releases of information as to I.B.

In February 2025, DHS filed separate petitions for goal change and for termination of the parental rights of Mother and Father. With respect to Father, DHS sought termination pursuant to 23 Pa.C.S. § 2511(a)(1) and (2),

as well as § 2511(b). A hearing was held on all the petitions over the course of two days, in which DHS produced evidence in support of the above.[3] Father stipulated to the existence of aggravating circumstances arising from the termination of the parental rights of Mother and Father as to I.B.'s siblings, which was then-recently affirmed by this Court. *See* N.T. Hearing, 4/30/25, at 8. Father additionally did not contest proper service of the petitions or that DHS exercised reasonable efforts. *See* N.T. Hearing, 3/19/25, at 13.

Beyond what has been recounted above, agency case manager Adrianna Maradiaga testified at the hearing that I.B. is flourishing with her resource parent and has formed a bond with her. I.B. calls the parent "mom" and looks to her for fulfilment of all her needs. Ms. Maradiaga noted that Father had not seen I.B. since infancy and, in her opinion, I.B. did not know Father or otherwise share any bond with him. Father did not testify or present any evidence.

Following the hearing, the family court entered the decree in question terminating Father's parental rights and the order changing I.B.'s permanency goal to adoption. Father timely appealed each decision and submitted concise statements of errors pursuant to Pa.R.A.P. 1925(a)(2)(i).[4] The court authored

---

[3] The family court appointed Linda Walters, Esquire, as guardian *ad litem* ("GAL") and legal counsel for I.B., finding no conflict between the legal interest and best interest of the approximately two-and-one-half-year-old child.

[4] This Court has *sua sponte* consolidated the termination and goal change cases pursuant to Pa.R.A.P. 513 due to Father raising similar claims concerning the same factual and procedural events.

an identical opinion in each matter discussing the evidence supporting its decisions. Father presents the following issues for our review:

> 1. Did the trial judge rule in error that [DHS] meet [*sic*] its burden oof [*sic*] proof that Father's parental rights to his children be terminated.
>
> 2. Did the trial judge rule in error that the [*sic*] terminating Father's rights would best serve the needs and welfare of the children.
>
> 3. Did the trial judge rule in error that the goal be change [*sic*] to adoption.

Father's brief at 4 (some capitalization altered).

We begin with the legal principles governing our review of decrees terminating parental rights:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

***In re Adoption of C.M.***, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). Further, "if competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Section 2511 of the Adoption Act sets forth the following two-part analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

***In re Adoption of B.G.S.***, 245 A.3d 700, 705 (Pa.Super. 2021) (cleaned up). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up).

To affirm a termination decree, we need only agree with the trial court that any one subsection of § 2511(a), as well as § 2511(b), is met. ***See In***

*re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). As it pertains to the case *sub judice*, we consider § 2511(a)(1) and (b), which provide as follows in relevant part:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), . . . the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Our Supreme Court has offered authoritative guidance on the inquiry central to termination pursuant to § 2511(a)(1):

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance[,] and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's

life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021) (cleaned up).

In arguing that the court erred, Father maintains that he could not work to fulfil his reunification objectives due to his incarceration and was not otherwise in any position to satisfy his single case plan goals. *See* Father's brief at 6. He relies upon case law standing for the proposition that incarceration cannot be the sole basis for terminating parental rights. *Id*. (citing *In re R.I.S.*, 36 A.3d 567 (Pa. 2011)). Father contends that there were never any visits established by DHS at the jail and that the agency's attempts to speak with him in person were thwarted by circumstances beyond his control. *Id*. at 7. He thus maintains that DHS failed to establish any settled purpose to relinquish his parental claim.

In addressing this issue, the family court reasoned as follows:

Father was not compliant with any of his single case plan objectives and none of the circumstances that brought I.B. into care had been alleviated. While the court recognizes that incarceration alone is not a sufficient basis for termination, the court nonetheless ruled in favor of termination because Father had not seen I.B. either in person or virtually while incarcerated in the two years she was in DHS care. Further, Father never made any effort to work with [DHS or the Community Umbrella Agency] on his single case plan objectives in regard to I.B., sign consents or releases that DHS required, nor had he inquired about her mental or physical well-being.

Family Court Opinion, 7/14/25, at 17 (some capitalization altered).

Upon review, we conclude that the family court's findings are supported by competent evidence. The certified record is abundantly clear that Father had failed or refused to perform parental duties in the six months preceding the filing of the termination petition. *See* 23 Pa.C.S. § 2511(a)(1). As the court highlighted, Father has not seen I.B. since infancy and made virtually no attempt to contact DHS to discuss either I.B. or his single case plan objectives throughout the life of the case. We note that Ms. Maradiaga rated Father's compliance as "none," indicating less than even minimal progress. *See* N.T. Hearing, 4/30/25, at 30.

The record further bears out that DHS sent mail to Father wherever he was incarcerated, and it was not returned as undeliverable. Father did not dispute at the hearing that he received appropriate updates and information from DHS, and in fact stipulated to DHS's reasonable efforts and proper service of the petitions in question. Despite this, Father expressed no desire to have any involvement in I.B.'s life. Therefore, we reject the assertion that the family court terminated Father's parental rights simply due to his incarceration. *See In re R.I.S.*, 36 A.3d at 285 (stating that a court must determine "whether the [incarcerated] parent has utilized those resources at his or her command while in prison to continue and pursue a close relationship with the child" (citation omitted)).

Having found statutory support for termination under subsection (a), we now pivot to § 2511(b), which is reviewed from the child's perspective. *See Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 51 (Pa.Super. 2024). In

conducting a § 2511(b) analysis, the court must place the child's "developmental, physical, and emotional needs and welfare above concerns for the parent. Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis." *Id*. (cleaned up). Those emotional needs "include intangibles such as love, comfort, security, and stability." *Id*. at 52 (cleaned up). "[I]f the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task." *Id*. (cleaned up). Finally, this Court "must keep the ticking clock of childhood ever in mind" and we "will not disturb [the court's bonding] assessment when [its] factual findings are supported by the record." *Id*. (cleaned up).

In contending that termination was not in I.B.'s best interests, Father tersely reiterates that the agency was unable to establish visitation while he was incarcerated. *See* Father's brief at 10. He therefore contends that no bond was established with the child, and that cannot be held against him based exclusively on his incarceration status. *Id*.

As to this claim, the family court recounted the credible testimony of Ms. Maradiaga, the agency case manager. She noted that I.B. was flourishing with the pre-adoptive foster parent, who met all of her needs and whom she called "mom." *See* Family Court Opinion, 7/14/24, at 17-18. The court accepted the opinion that I.B. had strongly bonded with the resource parent. *Id*. at 18. Conversely, it determined that there was no relationship whatsoever between Father and I.B., as she had only met Father as an infant

- 10 -

and had no interaction, virtual or otherwise, in the more than two years she had been involved with DHS. *Id*. Accordingly, the court concluded that termination would not have a detrimental impact on I.B.

Again, we find no fault with the court's determinations. The undisputed evidence demonstrated that I.B. is doing very well with her foster parent and that she looks to that person for all her daily care and needs. There was no testimony that I.B. had developed a bond with Father, whom she met only once as an infant, and therefore the court was within its rights to find that termination would not harm I.B. Indeed, Ms. Maradiaga opined that I.B. did not know who Father was at all. Father made zero efforts to take advantage of what means he had to establish a connection with I.B. from prison, which undermines his claim that he had no opportunity to create a bond. Hence, no relief is due.

In his final and related claim, Father challenges the family court's order changing I.B.'s permanency goal from reunification to adoption.[5] *See* Father's brief at 11-13. In so doing, he copies and pastes the argument he set forth relating to the court's determination that DHS met its burden with respect to § 2511(b).

This Court "review[s] goal-change orders pursuant to an abuse-of-discretion standard of review. As such, we must accept the trial court's

---

[5] While this challenge is at least arguably moot following our decision to affirm the family court's termination decree, *see In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa.Super. 2021), we address it in an abundance of caution.

findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law." ***Interest of D.R.-W.***, 227 A.3d 905, 917 (Pa.Super. 2020) (cleaned up).

Here, the family court determined that DHS met its burden for the court to change I.B.'s concurrent goal of reunification to that of adoption. As outlined above, our review of the record confirms the court's findings underpinning this conclusion. Under these circumstances, we conclude that the family court did not abuse its discretion in deciding that a goal change to adoption was in the best interests of I.B.

In sum, we affirm the decree terminating Father's parental rights as to I.B., as well as the order changing I.B.'s permanency goal to adoption.

Decree affirmed. Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/12/2025